IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ARTURO DE LA CERDA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3252 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Arturo De La Cerda ("De La Cerda"), seeks review of a decision by the defendant, Michael Astrue, the Commissioner of the Social Security Administration ("Commissioner"), granting De La Cerda's application for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 et seq., and for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., for a closed period from January 16, 2003 to January 11, 2007, but denying his application in all other respects.  After carefully reviewing the record, the court finds the Commissioner's decision should be reversed in part and remanded.

## I.  PROCEDURAL BACKGROUND

De La Cerda applied for social security disability benefits on February 25, 2005, claiming a severe back impairment, involving herniated discs in his lumbar spine, has rendered him unavailable to work since January 16, 2003.  Social Security Transcript ("TR") at 63 & 199-200. De La Cerda also asserts an undiagnosed mental pain disorder.  (TR 114). His claim was initially denied on April 11, 2005, and upon reconsideration on August 23, 2005. (TR 59).

De La Cerda filed a hearing request, and a hearing was held before an Administrative Law Judge ("ALJ") on August 16, 2007 (TR. 59). De La Cerda was represented by counsel at the hearing. Testimony was received from De La Cerda and Deborah A. Determan, a vocational expert ("VE"). The ALJ's partially adverse decision was issued on January 31, 2008. (TR 72) De La Cerda's request for review by the Appeals Council was denied on July 2, 2010, and again on December 6, 2010 (TR 6-9). His pending complaint for judicial review was timely filed on December 23, 2010.

## II.  THE ALJ'S DECISION

The ALJ evaluated De La Cerda's claims through all five steps of the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920. (T.R. 63-72). As reflected in his decision, the ALJ made the following findings:

1)   De La Cerda met the insured status requirements of the Social Security act as of January 16, 2003, the date the claimant became disabled.

2)   De La Cerda has not engaged in substantial gainful activity since January 16, 2003, the alleged onset date.

3)   At all times relevant to the decision, De La Cerda had the following severe combination of impairments: low back pain secondary to an L4-L5 fusion with radiating pain to the left lower extremity, disc bulge and tear at L1-L2, and poly substance abuse in remission (20 C.F.R. 404.1520(c) and 416.920(c)).

4)   From January 16, 2003 through January 11, 2007, the period which De La Cerda was disabled, De La Cerda did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d) and 416.920(d)).

5)   From January 16, 2003 through January 11, 2007, De La Cerda had the residual functional capacity to perform an overarching range of sedentary work. In addition, De La Cerda cannot push or pull levers repetitively with the upper or lower extremities bilaterally; cannot reach above shoulders; cannot do neck

2

flexion/extension/lateral rotation either prolonged or repetitively. Prolonged is defined as holding the neck in a rigid or fixed position for over 30 seconds rigidity similar to looking down a rifle or microscope, and repetitive is defined as moving the neck in those positions more than 45 degrees from the center, and from point "a" to "b" and repeatedly without intervening movements and that movement should occur in under 4 seconds. Bending twisting, and turning is occasionally limited. He cannot crawl or stoop, and, less than occasionally is rare. Squatting is possible and less than occasionally is rare. He cannot kneel. He can climb stairs but needs 7 steps or less, and if more, needs to pause and rest before proceeding. Gripping and grasping movements with the left nondominant upper extremities are frequent; handling, fingering, and feeling is frequent with the left extremity. The claimant should not use air or vibrating tools or motor vehicles. He should not work around moving machinery (not include fixed machines). He should not work around temperature extremes of heat, humidity, or cold. The ability to understand, remember, and carry out detailed instructions is markedly limited. The ability to understand, remember, and carry out short and simple instructions is mildly to moderately limited. The ability to make judgments on simple work related decisions is mildly limited. The ability to interact with the public is moderately limited; but can become markedly limited, and with co-workers and supervisors is moderately limited. The ability to respond to work pressures in a usual work setting at a job learned by simple demonstration that can be learned within 29 days is mildly limited. The ability to respond to changes in the usual work setting is not limited. In addition, when De La Cerda is seated, he needs to be able to shift in place while remaining on task. De La Cerda can only sit 15 minutes a time; stand only 5 minutes at a time; and sit up to 4 hours a day total. He would be absent from work due to pain at least 2 days per week.

6)   From January 16, 2003 through January 11, 2007, De La Cerda was unable to perform past relevant work (20 C.F.R. 404.1565 and 416.965).

7)   De La Cerda was born on July 8, 1964 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8)   De La Cerda has at least a high school education and is able to communicate in English.

9)   Transferability of job skills is not an issue because De La Cerda's past relevant work is unskilled.

3

10) From January 16, 2003 through January 11, 2007, considering De La Cerda's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1560(c), 404.1566, 416.960(c), and 416.966).

11) De La Cerda was under a disability, as defined by the Social Security Act, from January 16, 2003 through January 11, 2007.

12) Medical improvement occurred as of January 11, 2007, the date De La Cerda's disability ended.

13) Beginning on January 11, 2007, De La Cerda has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

14) Beginning on January 11,2007, De La Cerda has had the residual functional capacity to perform an overarching full range of sedentary work. In addition, he cannot push or pull levers repetitively with the upper or lower extremities bilaterally; cannot reach above shoulders; cannot do neck flexion/extension/lateral rotation either prolonged or repetitively. Prolonged is defined as holding the neck in a rigid or fixed position for over 30 seconds rigidity similar to looking down a rifle or microscope, and repetitive is defined as moving the neck in those positions more than 45 degrees from the center, and from point "a" to "b" and repeatedly without intervening movements and that movement should occur in under 4 seconds. Bending twisting, and turning is occasionally limited. He cannot crawl or stoop, and, less than occasionally is rare. Squatting is possible and less than occasionally is rare. He cannot kneel. He can climb stairs but needs 7 steps or less, and if more, needs to pause and rest before proceeding. Gripping and grasping movements with the left non-dominant upper extremities are frequent; handling, fingering, and feeling is frequent with the left extremity. The claimant should not use air or vibrating tools or motor vehicles. He should not work around moving machinery (not include fixed machines). He should not work around temperature extremes of heat, humidity, or cold. The ability to understand, remember, and carry out detailed instructions is markedly limited. The ability to understand, remember, and carry out short and simple instructions is mildly to moderately limited. The ability to make judgments on simple work related decisions is mildly limited. The ability to interact with the public is moderately limited; but can become markedly limited, and with co-workers and supervisors is moderately limited. The ability to respond to work pressures in a usual work setting at a job learned

4

by simple demonstration that can he learned within 29 days is mildly limited. The ability to respond to changes in the usual work setting is not limited. In addition, when De La Cerda is seated, he needs to be able to shift in place while remaining on task. He also needs to be able to stand 5 minutes every 30 minutes but can remain on task.

15)   The medical improvement that has occurred is related to the ability to work.

16)   Since January 11, 2007, De La Cerda's age category has not changed.

17)   Continuing through January 11, 2007 to the present (January 31, 2008), De La Cerda has been unable to perform past relevant work.

18)   Transferability of job skills is not an issue because De La Cerda's past relevant work is unskilled.

19)   Beginning on January 17, 2007, considering De La Cerda's age, education, work experience, and residual functional capacity, De La Cerda has been able to perform a significant number of jobs in the national economy.

20)   De La Cerda's disability ended on January 11, 2007.

5

### III.  ISSUES RAISED FOR JUDICIAL REVIEW

De La Cerda's complaint requests judicial review of the ALJ's decision that he was no longer disabled as of January 11, 2007.  De La Cerda raises the following arguments in support of his claim for reversal:

1)  The ALJ improperly found De La Cerda experienced medical improvement as of  January 11, 2007;

2)  The ALJ failed to make proper credibility findings as to De La Cerda's testimony of subjective complaints of pain;

3)  The hypothetical questions posed to the Vocational Expert by the ALJ were defective; and

4)  None of the jobs listed by the ALJ fall within the RFC adopted by the commissioner.

### IV.  THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

De La Cerda alleges he became disabled on January 16, 2003 because of herniated discs in his lumbar spine.  Plaintiff holds a GED.  His pre-disability work consisted entirely of unskilled labor.  On January 31, 2008, the date of the ALJ's decision, De La Cerda was forty-three years old.

On or about January 16, 2003, De La Cerda injured his back while working at a construction site.  De La Cerda has not been engaged in any substantial gainful activity since

6

that date.[1]   He was diagnosed by Dr. Andrew Messer in February of 2003 with "diffuse soft tissue type pain in the cervical, thoracic and lumbar region as well as chronic degenerative disc disease at T12-L1 of questionable significance."  (TR 252).  De La Cerda was ordered to physical therapy.  He again saw Dr. Messer in March of 2003.

De La Cerda underwent back surgery in the form of "an anterior and posterior lumbosacral spinal arthrodesis at the L5-S1 lumbosacral level" in March of 2006. (TR. 399). The operation was performed by Dr. Ric Jensen.   De La Cerda left the hospital early, against medical advice.   On March 29, 2006 Dr. Jensen reported that De La Cerda's "overall level of back pain has improved significantly as a result of his operative fusion." (TR. 574).

On July 22, 2006, Dr. Jensen  made the following observations:

> Plain film x-rays today demonstrate excellent appearance of [De La Cerda's] fusion construct with no complicating features identified. [De La Cerda] reports a significant reduction in his preoperative back pain. Said operative therapy was performed 3/2/06. This in the form of a circumferential lumbosacral spinal fusion at the L5-6 lumbosacral level. Arturo's surgical incisions are healing nicely. He is functioning with minimal restrictions at this juncture although does require pain medication after performing extensive physical activities.

(TR. 571).

De La Cerda was referred to post operative physical therapy by Dr. Jensen. (TR. 573). There is no record as to whether this physical therapy was completed and/or successful.

---

[1] De La Cerda worked at McDonalds for three days in October of 2003 and for Labor Ready for one day in October of 2003.

On September 14, 2006, De La Cerda underwent a psychological evaluation performed by John Streibel, PsyD.  (TR 413).   Dr. Steibel noted that De La Cerda "has some obvious physical concerns but testing would indicate some hypochondriacal features," but De La Cerda "will likely have some struggles with exploring any psychological response to the bodily complaints."  (TR 415).  He also noted De La Cerda "tends to endorse the entire gamut of vague physical complaints. . . ." (TR 415).  In his recommendation, Dr. Steibel stated that De La Cerda's physician "may wish to refer [De La Cerda] for a physical therapy evaluation." (TR 416).

Dr. Jensen again examined De La Cerda on September 20, 2006 and drafted two letters dated September 28, 2006, neither directed to a specific person or agency.  In one of the letters, Dr. Jensen provides the following summary of De La Cerda's progress:

> This patient is now nearing a 6 month post-operative phase whereupon he has achieved a significant reduction in his pre-operative back pain syndrome. However, due to the rather extensive nature of [De La Cerda's] lumbosacral spinal pathology, it is unlikely that an isolated surgical fusion procedure will produce complete and absolute resolution of [De La Cerda's] low back pain syndrome. However, I remain satisfied with [De La Cerda's] current response to surgical therapy as such. [De La Cerda's] surgical incisions have healed nicely. He is now tapering off his narcotic pain medications. I remain with my intention to have [De La Cerda] continue out patient physical therapy efforts for the coming 2 months. I have given [De La Cerda] a detailed prescription to undergo lumbosacral spinal physical therapy locally. I have also recommended that [De La Cerda] be considered for long term/permanent disability based upon his current symptom complex, what I perceive to be an inability to perform anything more than sedentary physical activities, and my opinion that [De La Cerda] will likely not be able to return to significant physical activities in the workplace until at least 12 months from the time of his operative therapy.

(TR 570).

8

The second letter provides a somewhat different picture of De La Cerda's prognosis:

> [De La Cerda's] pre-operative back pain syndrome has improved significantly over time although remains problematic. I do believe that within a reasonable degree of medical certainty that Arturo's preoperative lumbosacral spinal pathology was likely engendered per his direct involvement in workplace activities and injuries which have resulted in operative therapy and multiple conservative treatments thereof. At the present time, I feel that Arturo will be unable to perform gainful employment for at least the foreseeable future (at least 12 months). I also believe that Arturo will be incapable of performing even sedentary activities at a level of anything greater than 2 to 4 hours per day. Arturo will likely have a permanent partial impairment rating of at least 24 percent of the whole person (with respect to the lumbosacral spine) when he reaches a maximum level of medical improvement, [March, 2007]. I hereby put forth my recommendation that this patient be considered for long term/permanent disability based upon the significant restriction in range of motion within his lumbosacral spine and residual symptomatology including back pain and pain upon protracted standing/ambulating (as well as an inability to sit for protracted periods of time). This recommendation will remain enforce [sic] until further notice.

(TR 399).

Dr. Jensen examined De La Cerda on December 26, 2006 and again put his findings in a letter, (dated January 11, 2007), which provides:

> Arturo appears to have experienced a modest benefit in his low back pain syndrome as a result of said operative therapy. However, he continues to be relatively incapacitated at times relating to his persistent, residual mechanical back pain, as such. Arturo denies symptoms in the lower extremities which would be consistent with radiculopathy. He has yet to return to work in any form of gainful capacity.
>
> I thoroughly examined Arturo during todays [sic] clinic visit. No focal sensory or motor findings are identified in either Arturo's lower extremities. Arturo has palpable tenderness over the lower lumbosacral paraspinal musculature (left greater than right). Range of motion is limited in all planes. Aside from this,

there are no other focal findings of importance aside from palpable tenderness over the lower lumbosacral paraspinal musculature, as noted. Plain film x-rays of Arturo's lumbosacral spine performed during clinic visitation today demonstrate excellent appearance of the fusion construct with no complicating features identified.

At this point, I will plan to follow up with Arturo in final assessment in approximately 3 months. At that time, a final, high resolution CT scan of Arturo's lumbosacral spine will be performed. At that time, assessment of the totality of fusion consolidation will be undertaken. In the meantime, it is likely that Arturo will have to seek permanent disability and maintain in an off work status. I do not foresee the potential that Arturo will be able to return to work in any form of gainful capacity at anything more than sedentary levels of activity.

(TR 428).

De La Cerda subsequently underwent a Functional Capacity Evaluation on January 26, 2007, performed by Randy Presler, PT.  Presler opined that De La Cerda's "findings were not always consistent with anatomical and physiological principles" and due to Mr. De La Cerda's inconsistent efforts, the test was deemed invalid.  (TR 431).  Presler identified a number of specific inconsistencies including:

- De La Cerda displayed better low back range of motion when distracted than he did during specific low back range of motion tests;

- De La Cerda displayed better "gait pattern" when distracted than he displayed when Presler was specifically testing De La Cerda's walking ability;

- Grip testing was inconsistent even though inconsistent grip is not a "result of a lumbar injury/surgery."

- De La Cerda "displayed non-physiological/non-organic signs during his physical exam including an overreaction to light palpation of the lumbar spine . . . and an overreaction to low back and lower extremity movement."

10

- De La Cerda's pain response was "not a reliable indicator of his functional ability yet he [used] pain complaints to limit all activities prior to physical signs of stress on the spine or extremities."

(TR 432).

Despite the inconsistencies, Presler opined that "based on his test results and a review of medical information provided [to Presler] regarding [De La Cerda's] injury, he should be capable of functioning within at least the LIGHT physical demand category."  (TR 432). Presler also made the following recommendations:

1. Spinal forward bending should be limited to an Occasional basis through his full motion but he should be capable of Frequent bending through mid range. Prolonged, unsupported forward bent spinal postures and forward bending combined with twisting movements should be avoided.

2. I recommend he intermittently alter his position between sitting and standing/walking to minimize the effects of prolonged postures but he is capable of tolerating these tasks on a Frequent basis.

(TR 433).

Presler also found De La Cerda "exhibited Symptom Exaggeration and Inappropriate Illness Behavior during the evaluation."  (TR 436).   Due to the invalidity of the results, Presler opined "his functional ability will need to be estimated based on other medical findings or risk of harm issues." (TR 435).

De La Cerda was evaluated by Dr. Jensen on April 11, 2007 in response to the finding of the FCE performed by Mr. Presler. (TR 566).  Dr. Jensen reported that De La Cerda was complaining of  "nearly incapacitating back pain" and that De La Cerda reports he could not

"ambulat[e]" or sit for long periods of time.  (TR 566).   Dr. Jensen also noted that De La Cerda reported being unable to perform any workplace functions for more than 10 to 15 minutes at a time.  (TR 566).   He also stated that while "[De La Cerda] did experience a modicum of improvement in his low back" as a result of his surgery, it "failed to produce a significant improvement in his functional capacity." (TR 566).  Finally, despite Mr. Presler's findings in the FCE, Dr. Jensen opined that Arturo was still limited in function and  unable "to return to gainful employment at anything more than a sedentary level of activity." (TR 566).

On April 12, 2007, De La Cerda underwent a Psychiatric Diagnostic Evaluation, performed by Bruce D. Gutnik, M.D.  Dr. Gutnik conducted a comprehensive review of De La Cerda's medical records. (TR 442-52)  Based on his review of the medical records and his psychiatric evaluation of De La Cerda, Dr. Gutnik opined:

> [I]n my opinion, with a reasonable degree of medical certainty, Mr. De La Cerda has a Pain Disorder Associated with Psychological Factors. This implies that psychological factors have the major role in the onset, severity, exacerbation or maintenance of reported pain. Mr. De La Cerda was dramatic in his pain behaviors and pain descriptions in my office. He described pain essentially from his neck down to the bottom of his feet, including his arms. Records indicate that Mr. De La Cerda had complaints of severe pain without increase in blood pressure or pulse. Physical examinations could not objectively support his pain. A functional capacity evaluation was invalid, indicating symptom exaggeration. Mr. De La Cerda has not been fully compliant with treatment. An MMPI showed hypochondriacal features and that Mr. De La Cerda would use physical complaints to control others. Based on observations and the past medical records, I believe that Mr. De La Cerda has a Pain Disorder Associated with Psychological Factors. This Pain Disorder is not a result of his reported injury, but rather, the result of unconscious secondary gain.

(TR 453).

Dr. Gutnik further opined that De La Cerda was dependent on opioids and engaged in drug seeking behaviors. (TR 544). Additionally, he determined "[t]here are no work restrictions placed on Mr. De La Cerda from a psychiatric perspective based on his . . . work injury." (TR 454-55).

De La Cerda continued to receive various treatments, most frequently for pain allegedly associated with his back. Many of these treatments constituted trips to the emergency room and/or resulted in De La Cerda receiving pain killers. (see, e.g., TR 601, 604, 614, 616, 618, 620, 621, 629, 631, 730 & 745). Eventually one of the examining physicians expressed some concern about the frequency with which De La Cerda was visiting the emergency room and requesting narcotics and his "vague stories about [De La Cerda] cannot tolerate anti-inflammatories." (TR 755).

At the hearing, De La Cerda testified his use of Percocet and a Fentanyl patch does not control his pain and that he requires trips to the emergency room. (TR 116-17). He also testified that in the six months leading up to the hearing his health had declined and there were no times leading up to the ALJ hearing that De La Cerda was pain free. (TR 117-19). Further, the ALJ accepted as an offer of proof that De La Cerda's "pain syndrome has gotten a lot worse and harder to deal with" after his 2006 surgery. (TR 121).

The ALJ then posed questions based on hypothetical individuals to the VE. The first was based on the following assumptions:

> This individual has a vocational profile identical to the claimant's. This individual has the following residual functional capacity. This individual has an overarching residual functional capacity for a full range of sedentary work with the following additional functional restrictions. This individual cannot push or pull leverage repetitively with his upper or lower extremities bilaterally. This individual cannot reach above his shoulders. This individual

cannot perform neck flexion or extension or lateral rotation that is either prolonged or repetitive. I'll define prolonged. Prolonged is having to hold the neck in a rigid fixed position for more than 30 seconds. The rigidity of the neck position would be similar to the rigidity that would be required to look down a microscope or to look down a rifle sight. Repetitive is defined as follows. Repetitive is moving the neck in any of those positions more than 60 degrees from center, that is to say, moving straight forward. I'm sorry, 45 degrees, and it moves from point A to point B returning to point A and returning to point B with no intervening movements. And that movement AB, AB would be, would be, would occur in less than four seconds. There is no other limitation with regard to neck flexion, extension, or lateral rotation. Bending, twisting, and turning are limited to occasional. This individual cannot crawl. Stooping is possible but is less than occasional. I would say rare. Squatting is possible but less than occasional. I would say rare. He cannot kneel. He can climb stairs, but that flight of stairs would have to be seven steps or less. A flight of stairs greater than seven steps would require him to have the ability to pause and rest before proceeding.  Gripping and grasping movements with his left upper extremity, non-dominant, are limited to frequent. Handling, fingering, and feeling is with the left non-dominant extremity, limited to frequent. He cannot use air or vibrating tools. He cannot use motor vehicles. He cannot work around moving machinery. I define moving machinery as, machinery which is mobile. It does not include fixed machinery even if that machinery has exposed parts and even if those exposed parts extend out beyond the base of the machinery such as robotic arm. He cannot work in temperature extremes of heat, humidity, or cold. These are non-exertional mentally based limitations. And the limitations are not based upon cognitive dysfunction but are based upon a pain syndrome that, that affects the ability to do these limitations. Nevertheless for our purposes, they are functional limitations. I want to put it into context for you. The ability to understand, remember, and carry out detailed instructions is markedly limited. The ability to understand and remember short simple instructions is mildly to moderately limited. To carry them out is mildly limited. The ability to make judgments on simple work related decisions is mildly limited. The ability to interact with the public and co-workers is as follows. With the public, it's moderate but can become marked. With co-workers, is moderate. With supervisors, is mild, mild to limited. The ability to respond to work pressure in a usual work setting at a job which is, which can be learned by simple demonstration up to 29 days is mildly limited. To respond to changes in the usual work setting is no limitation.

14

(TR 135-37).

The VE identified three jobs that such an individual could perform in the national economy: (1) a document preparer; (2) a cutter and paster; and (3) an addresser.  (TR 138). The ALJ then asked the VE to assume the same hypothetical limitations with additional limitations including: (1) the ability to sit and shift, but remain on task and (2) the ability to stand for five minutes every half an hour, but still remain on task.  (TR 139).  The VE responded that the three positions would still apply.  (TR 139).

The final hypothetical posed to the VE involved the same assumptions as before with the following additional limitations: (1) the individual can only sit 15 minutes at any one time; (2) the individual can only stand at any one time for five minutes; (3) he cannot lift while seated; (4) he can only sit for up to four hours a day; and (5) he will be absent from work due to pain at least two days a week.  (TR. 139).  The VE opined that such a hypothetical person would be "precluded from competitive employment." (TR 139).

The ALJ's decision was issued on January 31, 2008.  Thereafter, De La Cerda submitted additional evidence and argument along with his request for review by the Appeals Council.  According to the Appeals Council decision, it followed the rules requiring it to review the ALJ's decision for a number of reasons.[2] (TR 6).  After doing so, on December 6, 2010,  the Appeals Council determined there was "no reason under our rules to review the Administrative Law Judge's decision." (TR 6). De La Cerda's request for review was denied.

---

[2]  Those reasons include: (1) whether the ALJ abused his discretion; (2) there is an error of law; (3) the ALJ's decision is not supported by substantial evidence; (4) broad policy or procedural issues that may affect public interest; or (5) whether new and material evidence is contrary to the weight of all the evidence in the record. (TR 6-7).

## V.  LEGAL ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed.  Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007).  Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome.  Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

1.   Medical improvement.

De La Cerda argues the decision of the ALJ should be reversed because there is not substantial evidence on the record as a whole to support the ALJ's decision De La Cerda experienced "medical improvement" on January 11, 2007.  Under the federal regulations "[a] medical improvement is defined as a decrease in the medical impairments present at the time of the most recent favorable medical condition."  Buress v. Apfel, 141 F.3d 875, 879 (8th Cir. 1998)(citing 20 C.F.R. 404.1594(b)(1).

16

In support of his decision, the ALJ contrasted the opinions of Dr. Jensen and Dr. Gutnik.  The ALJ specifically cited Dr. Jensen's letter of January 11, 2007 in which Dr. Jensen noted that the fusion of De La Cerda's back was "solid despite some tenderness" and that he did not foresee De La Cerda being able to "return to work in any form of gainful capacity at anything more than sedentary levels of activity." (TR 428).  The ALJ noted:

> Dr. Jensen says that sedentary work is the best of [sic] the claimant can do, but he gave no other limitations on January 11, 2007 such as the earlier limitations preventing more than four hours of work prior to and following his surgery (compare exhibit 16F with exhibit 13F and 12F). He could have given additional limitations, but he did not, and the undersigned finds that this supports the conclusions in this decision. In addition, Dr. Jensen's comments in January 2007 are consistent with physical therapy notes taken after the end of disability (see exhibits 16F and 17F).

In addition, the ALJ briefly cited to the FCE performed by Presler in which Presler opined De La Cerda "functioned in at least the light physical demand category," while acknowledging that the RFC was ultimately deemed invalid due to inconsistencies in Del La Cerda's testing behaviors  (TR 70).

As to the "undiagnosed mental pain disorder," the ALJ relied on the opinions of Dr. Gutnik and Dr. Striebel, both of whom found "no basis for the severity of the claimant's complaints on a psychiatric basis."  (TR 70).  In spite of acknowledging De La Cerda had a "pain disorder," Dr. Gutnik opined that "from a psychiatric perspective, Mr. De La Cerda can return to work on a full-time basis without restrictions at any time."  (TR 455).

After a careful review of the entire record, the court finds substantial evidence on the record exists to support the ALJ's conclusion that De La Cerda experienced medical improvement as of January 11, 2007.

17

The opinions of Dr. Jensen, as a treating physician, are entitled to controlling weight so long as they do not conflict with other evidence on the record.  See Prosch v Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000).    After surgery Dr. Jensen found De La Cerda experienced a significant reduction in his preoperative back pain,  (TR 570, 571 & 574), and was functioning with minimal restrictions (TR 571).  After the surgery, Dr. Jensen opined that De La Cerda could initially only perform "sedentary" work for a maximum of four hours a day.  (TR 399).

Dr. Jensen's opinion regarding to what extent De La Cerda may, or may not be disabled, is not due any deference "because a finding of disability is one reserved for the Commissioner."  Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008).  However, even assuming Dr. Jensen's opinion regarding De La Cerda's qualification for disability did merit any deference, his conclusion that De La Cerda is completely disabled is at odds with his opinion that De La Cerda could engage in "sedentary" work.  Dr. Jensen excluded the time limitation in the January 11, 2007 evaluation, simply stating De La Cerda's future work activity would still be limited to "sedentary" work, and on other occasions, Dr. Jensen's reports did not include any further restriction, including any sort of time limit.  (TR 428, 566 & 570).  Contrary to De La Cerda's arguments, Dr. Jensen was not "silent" on De La Cerda's capacity to return to work.  Dr. Jensen expressly opined on that very topic, distinguishing this case from those cited by De La Cerda:  Hutsell v. Massanari, 259 F.3d 707 (8th Cir. 2001) and Lauer v. Apfel, 245 F.3d 700, 705 (8th Cir. 2001).

Dr. Jensen's opinion that De La Cerda was disabled is also contradicted by his medical findings on the record.  Dr. Jensen indicated the fusion surgery was successfully completed, noting "[p]lain x-rays today demonstrate excellent appearance of De La Cerda's fusion construct with no complicating features identified." (TR 428 & 571).  This opinion was initially provided on July 22, 2006 and was reiterated on January 11, 2007.  In July of 2006,

18

Dr. Jensen reported that De La Cerda was "functioning with minimal restrictions . . . although [he required] pain medication after performing extensive physical activities. (TR 571). In his January letter, Dr. Jensen noted that aside from some palpable tenderness and limited range of motion, there were no other focal findings of importance. (TR 428). Thus, all of the physical signs pointed to a successful surgery and improvement. In fact, as evidenced by Dr. Jensen's letter of April 17, 2007, Dr. Jensen's opinion about De La Cerda's functional capacity appears to be almost entirely dependent on De La Cerda's subjective allegations of pain, as conveyed to Dr. Jensen. (TR 566). As discussed below, the ALJ had ample evidence to find De La Cerda's subjective statements of pain to be less than credible and not in accord with De La Cerda's physical condition.

Other evidence of record, including the FCE performed on January 26, 2007 in which the evaluator opined De La Cerda could engage in at least "light physical" activity, supports the conclusion that the fusion surgery produced medical improvement which allowed De La Cerda to engage in substantial gainful activity on January 11, 2007. Accordingly, there is sufficient evidence of record to support the ALJ's conclusion that De La Cerda experienced medical improvement as of January 11, 2007.

   2.   The ALJ's determination of credibility.

"It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [her] limitations." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995). Before the ALJ determines an applicant's RFC, the ALJ must determine the applicant's credibility, because subjective complaints play a role in assessing the RFC. Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005). See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must

19

evaluate the claimant's credibility."). An ALJ "is not required to discuss every piece of evidence submitted," and his "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

The ALJ must apply the factors found in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) in assessing the credibility of a claimant's subjective complaints, including: (1) the claimant's daily activities; (2) the duration frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.   An ALJ is not required to discuss each of these factors.   It is sufficient that the ALJ acknowledges and considers the factors prior to discounting the claimant's subjective complaints.  Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (quoting Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009)).

The ALJ stated he did not find De La Cerda's complaints of pain and his "alleged limitations at the end of the closed period" completely credible  (TR 71).  Under the pertinent regulations, the ALJ must provide reasons for such a finding.  20 C.F.R. 404.1529 & 416.929; Polanski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1983).

The ALJ provided several reasons for finding De La Cerda's complaints to be less than completely credible.  He noted that De La Cerda's complaints of pain are not consistent with the physical findings of Dr. Jensen's report in January of 2007, in which "other than some limitations in range of motion, Dr. Jensen identified no other focal findings of importance." (TR 70 & 428).

20

De La Cerda argued he suffers from an undiagnosed pain syndrome, but as noted by the ALJ, the record does not support such a finding.  The ALJ found that "symptom exaggeration" or "substance abuse" were more likely the cause. (TR 70).  There is ample support in the record for these findings.  For instance, in September of 2006 Dr. Striebel completed a psychological examination and noted the testing "indicate[d] some hypochondriacal features" manifested by De La Cerda's tendency to "endorse the entire gamut of vague physical complaints."  (TR 425).

The ALJ also considered the report of Dr. Gutnik's psychiatric examination of De La Cerda in which Dr. Gutnik reported:

> Mr. De La Cerda was dramatic in his pain behaviors and pain descriptions in my office. He described pain essentially from his neck down to the bottom of his feet, including his arms. Records indicate that Mr. De La Cerda had complaints of severe pain without increase in blood pressure or pulse. Physical examinations could not objectively support his pain. A functional capacity evaluation was invalid, indicating symptom exaggeration. Mr. De La Cerda has not been fully compliant with treatment. An MMPI showed hypochondriacal features and that Mr. De La Cerda would use physical complaints to control others.

(TR 453).

It is true Dr. Gutnik opined De La Cerda suffered from a "Pain Disorder Associated with Psychological Factors." (TR 452).  However, in the same report Dr. Gutnik  found from a "psychiatric perspective" De La Cerda could "return to work on a full time basis without restrictions at any time" seemingly downplaying the impact of the Pain Disorder.  (TR 455). In addition, the ALJ noted that the evidence of potential drug addiction and drug seeking behavior in the record added "complications" to the Pain Disorder diagnosis provided by Dr. Gutnik.   The record supports this concern, including suggestions De La Cerda has

21

downplayed or completely denied his use of alcohol despite evidence to the contrary. Compare (TR 123 &127)(De La Cerda testified that he had not consumed alcohol since July 19, 2006) with (TR 462)(treatment notes from November 2006 where De La Cerda admitted to drinking too much alcohol). There is also evidence on the record concerning his "drug seeking" behavior and his continued use of pain medications despite the fact he states the pain medications do not help him significantly. (TR 454). However, when his prescription for the pain killer Kadian was lost and the physician would not refill it, De La Cerda threatened to take street drugs to control the pain. (TR 522). Dr. Jensen also expressed concern over this behavior. (TR 569). Thus, the ALJ had reason to question the Pain Syndrome diagnosis as being derived more from De La Cerda's possible opiate addiction and exaggeration of his symptoms.

Finally, the FCE De La Cerda participated in was deemed invalid for a number of reasons, including symptom exaggeration. For instance, Presler observed De La Cerda overreacted to "light palpation of the lumbar spine," "overreact[ed] to lower extremity movement," and "[h]is response to pain did not always correlate with the physical findings, movement patterns and postures." (TR 432). De La Cerda argues that the FCE is of limited evidentiary value. Of course, the reason the FCE was deemed invalid was because the physical therapist conducting the exam observed what he believed to be exaggerations of pain and less than a full effort by De La Cerda. These observations support the ALJ's finding that De La Cerda was not entirely credible.

3.   Vocational expert testimony as substantial evidence.

A vocational expert's testimony is generally "substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of the claimant's deficiencies." Porch v. Charter, 115 F.3d 567,572 (8th Cir.

1997)(internal citations omitted). However, where the VE responds to a hypothetical that "captures the consequences of [the claimant's] deficiencies" the VE's testimony will be considered substantial evidence. Cox v. Astrue, 495 F.3d 614, 621 (8th Cir. 2007). De La Cerda argues that the testimony of the VE cannot constitute substantial evidence in this case because the VE's testimony was based on hypothetical questions that did not contain two restrictions which the FCE found De La Cerda to have. De La Cerda points to the following recommendations in the 2007 FCE: (1) De La Cerda should avoid "[p]rolonged, unsupported forward bent spinal postures;" and (2) the FCE recommends De La Cerda change his position from sitting to "standing/walking." De La Cerda believes the hypothetical questions posed to the VE contained restrictions inconsistent for those findings.

The court is unpersuaded by De La Cerda's argument. As an initial matter, the FCE referred to by De La Cerda was deemed invalid due to inconsistent results and De La Cerda's perceived lack of effort. Thus, it is of minimal evidentiary value to him.

However, even if the FCE had not been deemed invalid, the hypotheticals posed by the ALJ are not inconsistent with the terms of the FCE. For instance, the FCE report did not recommend that De La Cerda be allowed to periodically stand and walk. The FCE recommended that he alter his position "between sitting and standing/walking to minimize the effects of prolonged postures but he is capable of tolerating these tasks on a Frequent basis." (TR. 433). There is no express requirement for walking and the hypothetical posed by the ALJ takes into account intermittent breaks for standing. Accordingly, it is not inconsistent with the FCE.

Similarly, De La Cerda attempts to draw a distinction between the suggestion on the FCE that De La Cerda should avoid "[p]rolonged, unsupported forward bent spinal postures and forward bending combined with twisting movements," (TR 433) and the restrictions in

23

the hypothetical that "[b]ending, twisting, and turning are limited to occasional." (TR 136).
The court sees no inconsistency between these instructions and further notes that the
hypothetical posed by the AJL also included instructions that De La Cerda could not "perform
neck flexion or extension or lateral rotation" that is either prolonged or repetitive.  This
restriction specifically addresses De La Cerda's concerns with clerical work and thus,
"captured the consequences of [De La Cerda's] deficiencies." Cox, 495 F.3d at 621.


    4.    <u>The Vocational Expert's testimony</u>.


    Upon a finding of medical improvement, the ALJ then must determine whether the
medical improvement allowed De La Cerda to engage in substantial gainful activity.  De La
Cerda argues that the occupations proposed by the VE exceeded the RFC as determined by
the ALJ.  Specifically, De La Cerda argues all of the jobs cited by the VE require reasoning
at Level 2 and, under the ALJ's RFC determination, De La Cerda cannot perform jobs that
require reasoning at Level 2.


    In the hypothetical questions posed by the ALJ, he described De La Cerda's "ability
to understand, remember, and carry out detailed instructions is markedly limited.  The ability
to understand and remember short simple instructions is mildly to moderately limited.  To
carry [short simple instructions] out is mildly limited." (TR. 137).  The VE opined that De
La Cerda could perform the jobs of "cutter-and-paster" (DOT #249.587-014) and "addresser"
(DOT #209.587-010) both of which require reasoning at level 2.[3]  Under the DOT's
Appendix C, such reasoning is defined as the ability to "apply common sense understanding

---

[3] The VE also opined that De La Cerda could be a "document preparer."  This job requires
level 3 reasoning according to the DOT.  The Commissioner apparently concedes that based on the
RFC, De La Cerda could not undertake occupations which require reasoning at level 3.

to carry out detailed but uninvolved written or oral instructions [and] . . . [d]eal with problems involving a few concrete variables in or from standardized situations."   De La Cerda argues, based on the RFC, he cannot perform the occupations proposed by the VE because he is unable to understand or carry out any detailed instructions, as required by the DOT for level 2 reasoning.

Under 8th Circuit law, an applicant's ability to follow only simple job instructions or perform simple job tasks – as opposed to detailed instructions or tasks – is not inconsistent with level 2 reasoning.  Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010) (finding that simple job instructions are not necessarily inconsistent with uninvolved detailed instructions). However, De La Cerda's ability to follow and/or carry out even simple instructions or tasks was further limited by the ALJ, thus Moore does not address the question posed in this case. That is, can an individual who has a limited ability to understand and complete even simple tasks, engage in jobs that require level 2 reasoning under the DOT?

While it is true the definitions of the levels of reasoning found in the DOT amount to "the upper limit across all jobs in the occupational category," (Moore, 623 F.3d at 604),  the VE in this case was not asked to further explain why she felt someone with a limited ability to follow and carry out simple instructions and tasks would be able to perform the cited jobs requiring level 2 reasoning, i.e. the ability to carry out detailed, but uninvolved instructions. Further, the Commissioner cites to no authority holding an individual with a restricted ability to understand and perform even simple instructions is capable of engaging in an occupation requiring level 2 reasoning.  Because there is an unexplained conflict between the VE's testimony and the DOT, this case should be remanded for a finding of whether any jobs exist in the national economy that De La Cerda can perform given the limitations to his ability to understand , remember and carry out, even simple instructions.   See Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010) (finding where the VE testimony " 'conflicts with the DOT, the

25

DOT controls when the DOT classifications are not rebutted with VE testimony which demonstrates specific jobs . . . may be ones that a claimant can perform.' " (quoting Dobbins v. Barnhart, 182 Fed. Appx. 618, 619 (8th Cir. 2006)).

Accordingly, IT IS ORDERED:

1)      This matter is reversed and remanded for further proceeding in accordance with sentence four of 42 U.S.C. § 405(g).

2)      On remand the ALJ shall further develop the record in regard to whether a sufficient number of jobs exist in the national economy for an individual with De La Cerda's RFC, as defined by ALJ.

DATED this 11th day of January, 2012.

BY THE COURT:

_s/ Cheryl R. Zwart_____

United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.